Filed 5/12/22  Hamideh v. Wells Fargo Bank, N.A. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ASHRAF O. HAMIDEH et al., Plaintiffs and Appellants, v. WELLS FARGO BANK, N.A., Defendant and Respondent. | D078537 (Super. Ct. No. 37-2017-00045253-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Mashiri Law Firm, Alex Asil Mashiri; The Jami Law Firm and Tamim Jami, for Plaintiffs and Appellants.

Kading Briggs, Theresa A. Kading and Katherine A. Akamine, for Defendant and Respondent.

Appellants Ashraf Hamideh and Pouya Abdolrasoul filed a representative action under the Private Attorney General Act (PAGA) (Labor

Code,[1] § 2698 et seq.) against Wells Fargo Bank, N.A. (Wells Fargo), alleging the company violated the Labor Code by failing to provide compliant meal breaks to nonexempt employees. The case proceeded to a bench trial, after which the court decided Hamideh and Abdolrasoul (collectively "Plaintiffs") failed to demonstrate they were aggrieved employees because they had not established a violation as to themselves. In reaching its conclusion, the court declined to apply a rebuttable presumption of liability against Wells Fargo based on the information contained in time records. After the court entered judgment, the Supreme Court published its opinion in *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58 (*Donohue*). There, our high court held that a rebuttable presumption of liability based on time records is applicable in class actions at the summary judgment stage. (*Id.* at pp. 61, 78.)

Plaintiffs appeal the judgment, contending the trial court prejudicially erred by (1) failing to apply at trial a rebuttable presumption of liability based on time records; (2) failing to consider Wells Fargo's automatic payment of a meal premium for any noncompliant meal break as an adoptive admission; (3) concluding Wells Fargo's written meal policy is lawful; (4) concluding "Abdolrasoul was never scheduled for a meal period to start later than the end of the fifth hour"; and (5) making the aforementioned allegedly-erroneous decisions, which cumulatively resulted in prejudice.

We conclude that even if the trial court erred by failing to apply a rebuttable presumption of liability based on time records, the error was harmless. We further conclude that the court did not abuse its discretion in denying admission of hearsay evidence as an adoptive admission, and it correctly concluded Wells Fargo's meal period policy is lawful. We also find

---

[1] Further statutory references are to the Labor Code unless otherwise specified.

sufficient evidence supports the court's factual conclusion regarding Abdolrasoul's meal period schedule, and that there is no prejudice resulting from cumulative error in the matter before us. Accordingly, we will affirm the judgment.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Plaintiffs

Hamideh was employed by Wells Fargo as a nonexempt banker from May 3, 2012, through July 28, 2017, first at the Murrieta main branch and then at the Ynez Road branch. He worked at the Ynez Road branch from late March 2017 through July 28, 2017.

Abdolrasoul worked as a teller and lead teller at an in-store branch of Wells Fargo in a Vons in Scripps Ranch from February 20, 2015, through December 29, 2017.

### B. The Complaint

Hamideh filed a complaint against Wells Fargo in November 2017 as a PAGA representative. He was joined by Abdolrasoul as a co-plaintiff in filing a first amended complaint on January 5, 2018. They filed a second amended complaint (SAC) on August 15, 2018. The SAC was brought on behalf of allegedly aggrieved non-exempt Wells Fargo employees who received at least one meal premium payment from September 18, 2016, through December 31, 2019. The SAC alleged that Wells Fargo violated sections 226.7 and 512, by failing to provide meal periods, and by engaging in a standard practice of failing to relieve employees for meal breaks or discouraging employees from taking them, instead paying employees an additional hour of pay. The SAC's single cause of action sought civil penalties under section 2699.

The case eventually proceeded to a bifurcated bench trial.

## C. Time Recording System

Wells Fargo uses a timekeeping system called Time Tracker, on which it trains new employees. Wells Fargo trained Hamideh and Abdolrasoul on the system when they were hired. Each day, employees manually type into Time Tracker the start and end times of their workdays, as well as the start and end times of their meal breaks.[2]

After employees save their entries, the program reviews the information and identifies any work shifts that indicate the employee failed to record a meal period, the employee's meal period was shorter than 30 minutes, or the employee's meal period began after the end of the fifth hour of work. If any of these three events occurs, Time Tracker prompts the California employees to select between two options: (1) "I had no opportunity to take my compliant meal period"; or (2) "I was provided the opportunity to take my compliant meal period."

The Time Tracker training manual defines a "compliant meal period" as "[a]t least 30 minutes in length and uninterrupted," "[b]egin[ning] no later than the end of [the] 5th hour of working time," and which the employee "cannot be encouraged to skip, delay or shorten."

At the end of each week, the Time Tracker prompts employees to certify that the information is accurate. After the employee completes inputting time and certifies that the information is correct, Time Tracker entries are automatically transmitted to payroll. When nonexempt employees select the option that says they did not have an opportunity to take a compliant meal period, the system automatically pays a meal period premium, which is an extra hour of pay (see § 226.7, subd. (c)).

---

[2]    Wells Fargo suggests employees enter their time on a daily basis, but employees have the entire week to input the information.

Wells Fargo does not investigate employee reports that they had no opportunity to take a compliant meal period; the system issues compensation automatically based solely on employee reporting. One Wells Fargo supervisor testified that he learned a couple times that nonexempt employees had selected they did not have the opportunity for a meal period, but he did nothing to investigate on those occasions. And he had never asked an employee why they selected any particular answer in response to the prompt.

D. Wells Fargo's Policies and Systems

Wells Fargo posted a copy of its "California Meal & Break Policy," contained in Exhibit 165, at every work location in California, including the branches where Hamideh and Abdolrasoul worked. This document states, "Nonexempt team members can work no more than 5 hours without taking an uninterrupted meal period of at least 30 minutes. The first meal period must begin no later than the end of your 5th hour of work." It also says, "If you would like to take your meal period earlier than scheduled, after the end of the 5th hour of work (or 10th hour for the second meal period), or voluntarily skip your meal period you must consult with your manager."

The company's intranet Teamworks Manager Center's "Meal & Rest Periods" pages, Exhibit 155, states, "Nonexempt team members can work no more than 5 hours without being provided the opportunity to take an uninterrupted meal period of at least 30 minutes. The first meal period must begin no later than the end of the 5th hour of work."

Wells Fargo's employee handbooks from July 2016 through January 2020 (Exhibits 157-164) indicate that several states have specific regulations, and they direct employees to check with their managers and follow the appropriate practices for their state. Employees receive specific training

about the meal policy, and the training information remains accessible on the company intranet throughout the time of employment.

A different Wells Fargo document, Exhibit 5, also entitled "California Meal Period and Rest Break Policy" explains it is the company's policy to provide meal periods within certain timeframes, stating, "You can work no more than 5 hours without taking at least a 30-minute meal period; a second 30-minute meal period must be taken if you work more than 5 hours after your first meal period has ended." Another bullet point, says, "You may not take the meal period later than 5 hours after starting the work day, unless for a specific *business* reason that is preapproved by your manager. If you are not hungry when the meal period must be taken, you are still required to take at least a 30-minute meal period, even if you don't eat."

Wells Fargo scheduled meal periods through a software program called CloudCords, which automatically scheduled the meal breaks to begin before the end of the fifth hour of employment and to last at least 30 minutes.

Exhibit 168, a Manager Tip Sheet explains, "Meal and rest breaks must be provided in states where there are requirements and it should be a best practice to use CloudCords to schedule breaks and meals in states without requirements."

### E.  Plaintiffs' Time Records

Hamideh's Time Tracker records show 25 instances in which he selected the option that he had no opportunity to take a compliant meal period. These all occurred at the Ynez Road branch. On each of these occasions, he recorded a meal period that began before the sixth hour of work. On the dates he selected he did not have an opportunity for a compliant meal break while employed at the Ynez Road branch, nine other individuals also selected that option.

6

Abdolrasoul's Time Tracker records show 46 instances in which he selected that he had an opportunity to take a compliant meal break but did not, and seven instances in which he recorded that he did not have an opportunity to take a compliant meal break. On each of these seven occasions, Abdolrasoul recorded meal periods of at least 30 minutes that began within one hour after the end of the fifth hour of work. No other employees at the same branch indicated they had no opportunity to take a compliant meal period on the same days that Abdolrasoul did. There was one entry by an employee indicating that person was not offered a compliant meal period during the relevant time period, but it was not on any of the days Abdolrasoul indicated he had no opportunity to take a compliant meal period.

Abdolrasoul's break schedule for April 30, 2017 through June 2, 2017 (Exhibit 25) showed he was scheduled for his meal breaks to begin before the end of the fifth hour of work for each shift except for May 16, on which his shift was scheduled to begin at 9:45 a.m., and his meal break was scheduled to commence at 2:45 p.m. Time records indicate Abdolrasoul began his meal break five hours and 45 minutes after the start of his shift that day. He indicated in Time Tracker that he was not provided an opportunity to take a compliant meal period.

F. Hamideh's Testimony

Hamideh testified at deposition that he could not recall the specifics of each of the 25 occasions on which he indicated in Time Tracker that he had no opportunity to take a compliant meal break, but in several instances, he was scheduled to take his meal break outside the compliant period. He could not remember any other reasons for selecting the option, stating he had not been offered a compliant meal period.

He believed the branches where he worked were understaffed, based on the volume of work each employee was expected to complete, the length of lines, and length of time customers waited. When asked if noncompliant meal periods were times in which he was not able to complete the meal period before the end of the fifth hour of work, he said that was correct. And when asked if he needed to complete the meal period by the end of the fifth hour, Hamideh responded "I needed to take my meal period by my fifth hour."

At trial, Hamideh testified he was not relieved for a timely meal period 25 times. He did not remember the dates on which he indicated he had no opportunity to take a compliant meal break, but he remembered they occurred at the Ynez Road branch and that each time it was because the branch was understaffed, they were busy, and he "would be scheduled to go outside of [the] fifth hour." He also testified at trial that the word "compliant" did not mean he needed to *complete* the 30-minute uninterrupted meal period before the end of the fifth hour of work.

### G. Testimony from Hamideh's Supervisor

Paul Rodriguez, Hamideh's supervisor at the Ynez Road branch, testified at trial that he never observed an occasion when Hamideh was not supplied the opportunity to take a compliant meal break or an occasion when the branch was understaffed. He also testified that Hamideh preferred to take the last possible meal break among the bankers.

### H. Abdolrasoul's Testimony

Abdolrasoul testified at deposition that he could not recall the specifics of the seven occasions on which he indicated he had no opportunity to take a compliant meal break. He said they were understaffed, he was busy with customers, and people were waiting in line.

8

At trial, Abdolrasoul testified he was not relieved for a timely meal period 53 times, and on seven of those occasions, he had no opportunity to take a compliant meal period. He explained that on those seven occasions there was no one in the branch to relieve him; he was the only teller or lead teller who was handling cash, so he had to stay and help customers.

I. Testimony from Abdolrasoul's Supervisors and Other Employees

Haley Bertrand, who supervised Abdolrasoul, testified she never observed an occasion when Wells Fargo did not provide Abdolrasoul the opportunity to take a compliant meal period. She used CloudCords to schedule meal periods, and she printed and distributed the schedules to employees. She testified that Abdolrasoul often did not like taking the meal period at its scheduled time and would try to avoid taking the meal break or would take it as late as possible.

She had observed Abdolrasoul failing to start his meal break at the scheduled time, either when distracted by talking with other employees or when there was an influx of customers. She informed employees that they were not expected to delay lunch past the end of the fifth hour to assist a customer and explained how to take the meal break even if a customer was waiting in line. She also witnessed Abdolrasoul return from meal breaks early. She coached Abdolrasoul specifically on how to improve on taking his meal period when it was scheduled. This concern was documented in Abdolrasoul's employee evaluations.

She also explained that it was not her responsibility—or any branch employee's responsibility—to investigate the accuracy of an employee's selection in response to the meal period prompt. This was so even though she had concluded some employees had an opportunity for a compliant meal period but reported they had not.

Marquel Gerson, another supervisor, testified that employees were told they were not expected to delay their meal breaks past the fifth hour to assist customers. She also recalled times when Abdolrasoul indicated in Time Tracker that he was not provided the opportunity to take a compliant meal period when she knew he was provided the opportunity. However, she never instructed him to change a response he entered in Time Tracker.

Cameron Andrew began working for Wells Fargo in July of 2019 as a teller at the Scripps Ranch branch inside Vons, where Abdolrasoul had worked. He testified he could recall shifts where he was unable to take a meal period according to his schedule. Once he was the only teller, and he inputted that he was not provided an adequate meal period. His manager tried calling other branches to see if they could get coverage to allow him to take the meal break, but none were available. He recalled one instance where he was provided an opportunity to take a compliant meal break, but he did not. He also could recall moments where coworkers were not able to take compliant meal periods but said team members at the branch generally take their meal periods according to the schedule.

Jessica Nicolini testified that when the branch across the street closed, her branch became busy, so she had started her lunch break after the end of the fifth hour of work. She explained that employees tried to take meal periods as scheduled, but sometimes if they were extremely busy, they might start a few minutes late.

## J. The Court's Decision

Following written closing argument, the court issued a tentative decision in favor of Wells Fargo, concluding the plaintiffs were not aggrieved employees. Plaintiffs requested a statement of decision.

Wells Fargo submitted a proposed statement of decision, to which the Plaintiffs filed objections.

The court issued its statement of decision on September 24, 2020. Plaintiffs filed objections and amended objections. The court considered the objections and entered judgment in favor of Wells Fargo on October 14, 2020. Plaintiffs timely appealed.

## II.

## DISCUSSION

### A. Legal Principles

#### 1. *California Meal Break Requirements*

Industrial Welfare Commission wage order No. 4-2001 (Wage Order No. 4) requires an employer to provide a meal period of not less than 30 minutes to each person employed for a work period of more than five hours. (Wage Order No. 4, § 11(A); Lab. Code, § 512, subd. (a); *Donohue*, *supra*, 11 Cal.5th at p. 67.) "This means that employers must generally provide 'a first meal period [of at least 30 minutes] no later than the end of an employee's fifth hour of work, and a second meal period [of at least 30 minutes] no later than the end of an employee's 10th hour of work.' " (*Donohue*, at p. 67, quoting *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1041 (*Brinker*).)

The employer is "not obligated to police meal breaks and ensure no work thereafter is performed" (*Brinker*, *supra*, 53 Cal.4th at p. 1040), but it must relieve the employee of all duty, and it must refrain from discouraging or impeding an employee from taking an uninterrupted 30-minute break. (*Donohue*, *supra*, 11 Cal.5th at p. 67.) " 'Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations, and work by a relieved employee during a meal break does not thereby place the employer

11

in violation of its obligations and create liability for premium pay . . . .' "
(*Donohue*, at pp. 76-77, quoting *Brinker*, at pp. 1040-1041.)

If the employer fails to provide the employee with a compliant meal period, "the employer must provide the employee with premium pay for the violation." (*Donohue, supra*, 11 Cal.5th at p. 67.) Premium pay is one hour of pay at the regular rate of compensation for each workday on which the meal period is not provided. (*Ibid.*; Wage Order No. 4, § 11(B), Cal. Code. Reg., tit. 8, § 11040, subd. 11(B); Lab Code, § 226.7, subd. (c).) Additionally, the employer must pay the employee for the time worked during the meal period if it knew or reasonably should have known the employee worked through the meal period. (*Donohue*, at p. 68; *Brinker, supra*, 53 Cal.4th at p. 1040, fn. 19.) "To avoid liability, an employer must provide its employees with full and timely meal periods whenever those meal periods are required."[3] (*Donohue*, at p. 68.)

The premium pay structure "reflects the Legislatures' and the [Industrial Welfare Commission's (IWC)] determination that infringements on meal period requirements threaten employees' health and safety whenever they occur [Citations], and the scheme was enacted to address inadequate employer compliance [Citations]." (*Donohue, supra*, 11 Cal.5th at p. 70.)

2. *PAGA Standing Requirements*

PAGA (§ 2698 et seq.) deputizes employees who have suffered a Labor Code violation or violations of IWC wage order provisions, permitting them to bring a representative action on behalf of the state to enforce labor laws. (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 80-81 (*Kim*);

[3]     "By requiring premium pay for any violation, no matter how minor, the structure makes clear that employers must provide compliant meal periods whenever such a period is triggered." (*Donohue*, at p. 69.)

*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 386.) To have standing to bring a representative action for PAGA violations, a plaintiff must be an "aggrieved employee." (§ 2699, subd. (a).) An aggrieved employee is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (§ 2699, subd.(c).)

PAGA standing requires proof that the plaintiff was employed by the alleged violator and is someone against whom the alleged violations were committed. (*Kim, supra,* 9 Cal.5th at p. 84; § 2699, subd. (c).) "The *remedy* for a Labor Code violation, through settlement or other means, is distinct from the *fact* of the violation itself. For example, employers can pay an additional hour of wages as a remedy for failing to provide meal and rest breaks. (§ 226.7, subd. (c).) But [the Supreme Court has] held that payment of this statutory remedy 'does not *excuse* a section 226.7 violation.' " (*Kim,* at p. 84, quoting *Kirby v. Immoos Fire Protection, Inc.*(2012) 53 Cal.4th 1244, 1256.)

### 3. Donohue *& the Rebuttable Presumption of Liability*

Plaintiffs argue that the court improperly declined to apply a rebuttable presumption of liability against Wells Fargo based on the time records. This presumption was first introduced in Justice Werdegar's concurring opinion in *Brinker* (*Brinker, supra,* 53 Cal.4th at pp. 1053-1055 (conc. opn. of Werdegar, J.))*,* but it was not adopted by our Supreme Court in *Donohue* until after the court entered judgment in the matter before us. (See *Donohue, supra,* 11 Cal.5th at pp. 74-76.)

In *Donohue*, the employer used an electronic timekeeping system that required employees to use work desktop computers to punch in and out at the beginning and end of the day, and at the beginning and end of the meal

13

period. (*Donohue*, *supra*, 11 Cal.5th at p. 62.) The system rounded time punches to the nearest 10-minute increment. (*Ibid.*) If the system showed a missed meal period, one shorter than 30 minutes, or a meal period that began after five hours of work, the company paid the employee a premium wage. (*Ibid.*) The employer relied on the rounded time punches to determine if a meal period was short or delayed. (*Id.* at p. 63.)

Donohue brought a class action against the employer and filed a motion for summary adjudication, arguing the company improperly rounded time records and consequently failed to pay premium wages for noncompliant meal periods. (*Donohue*, *supra*, 11 Cal.5th at p. 63.) The employer filed a cross-motion for summary judgment, arguing it did not have a uniform policy of denying compliant meal periods. (*Id.* at p. 64.) The trial court granted the employer's motion for summary judgment, and the Court of Appeal affirmed. (*Id.* at pp. 64-65.) The Supreme Court considered whether the company's rounding policy in the context of meal periods violated California law and concluded it did. (*Id.* at p. 61.) It also held that time records that show noncompliant meal periods raise a rebuttable presumption of meal period violations. (*Ibid.*) It is the latter holding that is relevant to the case before us.

*Donohue* deals with the rebuttable presumption of employer liability in the context of a class action at the summary judgment stage. (*Donohue*, *supra*, 11 Cal.5th p. 76.) If the time records that have been introduced are accurate, they will reflect a company's liability. (*Ibid.*) However, if the records are not accurate, the employer can introduce evidence to rebut the presumption of liability (i.e., noncompliant meal breaks). (*Ibid.*) Although *Donohue* focuses on the waiver affirmative defense as a way to rebut the presumption, explaining that an employer can plead and prove employees

14

were offered compliant meal breaks but waived them (*ibid*), *Donohue* does not limit an employer to that affirmative defense because it recognizes that it remains the plaintiff's burden to prove each element of the cause of action entitling the plaintiff to judgment. (See *id.* at p 80.)

The court explains how the rebuttable presumption functions at the summary judgment stage: "If time records show missed, short, or delayed meal periods with no indication of proper compensation, then a rebuttable presumption arises. Employers can rebut the presumption by presenting evidence that employees were compensated for noncompliant meal periods or that they had in fact been provided compliant meal periods during which they chose to work." (*Donohue*, *supra*, 11 Cal.5th at p. 77.) The rebuttable presumption "requires employers to give employees a mechanism for recording their meal periods and to ensure that employees use the mechanism properly." (*Ibid.*)

The consequence of employees failing to use the mechanism for recording meal period properly is that an employer will pay employees a meal period premium when none is due. *Donohue* reiterated the rules set forth in *Brinker*: "An employer is liable only if it does not provide an employee with the opportunity to take a compliant meal period. The employer is not liable if the employee chooses to take a short or delayed meal period or no meal period at all. The employer is not required to police meal periods to make sure no work is performed. Instead, the employer's duty is to ensure that it provides the employee with bona fide relief from duty and that this is accurately reflected in the employer's time records. Otherwise, the employer must pay the employee premium wages for any noncompliant meal period." (*Donohue*, *supra*, 11 Cal.5th at p. 78.)

*Donohue* applied the usual summary adjudication standards.  It explained that when the defendant employer moves for summary adjudication, it must satisfy the burden of production to make a prima facie case that at least one element of the cause of action cannot be established, or it must show a complete defense.  (*Donohue*, *supra*, 11 Cal.5th at p. 79.)  To accomplish this, the employer can establish that it genuinely relieved employees from duty on time but employees chose to work voluntarily and delay their meal breaks.  (*Ibid.*)  At that point, the plaintiffs would bear the burden of showing there was a triable issue of material fact, but the defendant would bear the burden of persuasion to show there was no issue of material fact in order to earn a judgment as a matter of law.  (*Id.* at pp. 79-80.)

However, when the plaintiff moves for summary adjudication, the plaintiff meets its burden by proving each element of the cause of action.  (*Donohue, supra*, 11 Cal.5th at p. 80.)  It can satisfy this burden with time records that raise a rebuttable presumption of meal period violations.  Once it introduces time records demonstrating violations, the burden shifts to the employer to show there is a triable issue of material fact.  (*Ibid.*)  "But the plaintiff bears the ultimate burden of persuasion to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." (*Ibid.*)

In other words, the burdens of persuasion do not change with the adoption of this rebuttable presumption.  The plaintiff still bears the burden of proving all elements of the cause of action, though the presumption—if not rebutted—fulfills part of that burden.  The defendant still bears the burden of proving all elements of an affirmative defense.

16

B. Application of Rebuttable Presumption in PAGA Action

Whether the court erred by failing to apply a rebuttable presumption of meal period violations following the introduction of Wells Fargo's time records is a legal question we review de novo. (*Navigators Specialty Insurance Company v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287 (*Navigators Specialty*) [misallocation of burden of proof is a legal error, not a factual one].)

Justice Werdegar introduced the rebuttable presumption in a concurrence in *Brinker* in the context of class certification. (*Brinker, supra*, 53 Cal.4th at pp. 1053-1055 (conc. opn. of Werdegar, J.).) Although the Supreme Court extended the rebuttable presumption beyond class certification to summary judgment, it did not address whether the presumption applies at trial[4] or whether it applies in a PAGA action. (*Donohue, supra*, 11 Cal.5th at pp. 61, 74.) *Donohue*'s focus was on cause of action for damages, not one exclusively for penalties.

The court explained that the rebuttable presumption does not apply unless the "time records show missed, short, or delayed meal periods with no indication of proper compensation" and also that "[e]mployers can rebut the presumption by presenting evidence that employees were compensated by noncompliant meal periods." (*Donohue, supra*, 11 Cal.5th at p. 77.) Applying

---

[4]     Our colleagues in the Third Division have concluded that the rebuttable presumption applies at trial. (*Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685.) However, the issue of how the rebuttable presumption applied revolved around whether it could be used to establish a theory of class liability. (*Id.* at pp. 724-727.) The court did not consider whether the presumption applied to the PAGA claims because the PAGA claims were dismissed. (*Id.* at pp. 709-714 [remanding the matter for erroneously dismissing some PAGA claims as unmanageable when PAGA is an enforcement action not based on class certification].)

17

the rebuttable presumption effectively "requires employers to give employees a mechanism for recording their meal periods and to ensure that employees use the mechanism properly." (*Ibid.*) A consequence of employees failing to properly use the time recording mechanism is that an employer will pay employees a meal premium when none is due.

But in a PAGA action, courts are not concerned with damages. Damages and civil penalties serve different purposes: " 'Damages are intended to be compensatory, to make one whole. [Citation.] Accordingly, there must be an injury to compensate. On the other hand, "Civil penalties, like punitive damages, are intended to punish the wrongdoer and to deter future misconduct." [Citation.] An act may be wrongful and subject to civil penalties even if it does not result in injury.' " (*Kim, supra*, 9 Cal.5th at pp. 85-86, quoting *Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 681.) In the context of a PAGA action, the court does not consider whether the plaintiffs have been compensated. But in *Donohue*, that was very much a concern of the court. It emphasized paying a meal premium could prevent application of the rebuttable presumption or at least rebut it. (*Donohue, supra*, 11 Cal.5th at p. 77.) This casts doubt on the applicability of the rebuttable presumption in the context of a PAGA action because compensation is not necessarily at issue in a PAGA action.

Assuming the rebuttable presumption applies in this case, the court committed error by declining to apply it. However, even accepting the court's failure to apply the rebuttable presumption as error, we would conclude any such error was harmless.

C. Substantive Evidence Supports the Court's Conclusions

"To establish prejudice, a party must show 'a reasonable probability that in the absence of the error, a result more favorable to the [appellant]

would have been reached.' [Citation.]" (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161.) We consider whether there is substantial evidence to support the court's ultimate conclusion that the plaintiffs did not establish a meal break violation and therefore are not "aggrieved employees" under PAGA. (*Navigators Specialty, supra,* 6 Cal.App.5th at p. 1287-1288 [misallocation of burden not prejudicial if sufficiency of evidence supports finding]; *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) If so, the error is harmless.

" 'Substantial evidence' is evidence of ' "ponderable legal significance." ' " (*Sasco Electric v. Fair Employment & Housing Com.* (2009) 176 Cal.App.4th 532, 535 (*Sasco*).) We consider "whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) The evidence " ' "must be reasonable in nature, credible, and of solid value." ' " (*Sasco,* at p. 535.) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid.*; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.) "If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

Here, Wells Fargo instituted a system like the one identified in *Donohue* but without rounding. The mechanism allowed for accurate reporting of meal periods, and Wells Fargo trained employees in how to use the system properly. Although Wells Fargo had systems in place to ensure employees were taking meal periods on schedule, when employees reported

meal periods were delayed, the company automatically paid premium wages. This system worked like the court in *Donohue* indicated a system should. (*See Donohue*, *supra*, 11 Cal.5th at p. 78.)

However, Wells Fargo argued that Plaintiffs' time records were inaccurate due to employee error, thereby challenging the presumption of liability created by the time records. To reach its conclusion that Plaintiffs were not aggrieved employees, the court was persuaded by Wells Fargo's evidence, and that conclusion is supported by substantial evidence.

### 1. *Hamideh*

At trial, Hamideh testified that each time he was not offered a compliant meal period, it was at the Ynez Road branch, it was always when the branch was understaffed and busy, and he was "scheduled to go outside of [the] fifth hour." Hamideh specified that he did not understand the word "compliant" to mean the meal period had to be completed before the end of the fifth hour of work. The court did not find the testimony credible.

During his deposition, Hamideh testified he "needed to take [his] meal period by [the] fifth hour," and that meant he had to *complete* the meal period by the end of the fifth hour. He did not mention the branch being busy or understaffed as a reason for the delayed meal periods. Instead, he explained that in several instances he was scheduled to take his meal break outside the compliant period of time, and that was the only reason he selected the option stating he had not been offered a compliant meal period.

The deposition testimony revealed that Hamideh believed he was scheduled to complete his meal break after the start of the sixth hour of work, and that was why he selected that he had not been offered a compliant meal period. Not only did that differ from his trial testimony, in which he testified delays were because the branch was busy as well as because he was

20

scheduled to begin his meal breaks after the end of the fifth hour of work, but it also indicated a lack of understanding of "compliant" at the time he completed the documentation, casting doubt on the accuracy of his Time Tracker selections.

Paul Rodriguez supervised Hamideh at the Ynez Road branch. He remembered that Hamideh preferred to take the last scheduled meal break, but he never observed an occasion when Hamideh was not provided an opportunity to take a compliant meal break. The implication was that Hamideh was scheduled to start his meal breaks before the end of the fifth hour but chose not to.

In weighing the evidence presented by Hamideh and Wells Fargo, the trial court noted that Hamideh's testimony was not corroborated and was contradicted by supervisors. The trial court explained that Hamideh's testimony had been undermined by the information he supplied during deposition. And it concluded Hamideh was not credible, and the supervisor testimony was credible.

### 2. *Abdolrasoul*

Abdolrasoul testified at trial that on seven occasions, there was no one in the branch to relieve him on time for his scheduled meal breaks because he was the only one handling cash, and he had to stay to help customers. He agreed that when he was completing the Time Tracker documentation, he considered a "compliant" meal period to be at least 30 minutes long, uninterrupted, and completed before the fifth hour of work.

During his deposition, he could not recall the specifics of the seven occasions on which he reported the lack of an opportunity to take a compliant meal period but said in general it would have been because the branch was understaffed, he was busy with customers, and people were waiting in line.

21

Abdolrasoul's explanation for the delayed meal breaks was supported by some testimony by Andrew and Nicolini. Andrew testified that he could recall shifts where he was not able to take his meal break according to the schedule because he was the only teller and the manager was not able to get coverage, despite efforts to do so. Nicolini likewise testified that there were occasions on which she took her break a few minutes late because the branch was busy. They both said that employees generally took their meal periods according to the schedule.

But Abdolrasoul's accounting was contradicted by other evidence. Gerson, one of his supervisors testified that she recalled times when Abdolrasoul was provided the opportunity to take a compliant meal break but had reported in Time Tracker that he had not. She also testified that employees were not expected to delay meal breaks past the fifth hour of work in order to assist customers.

Another supervisor, Bertrand testified she never observed an occasion when Wells Fargo did not provide Abdolrasoul the opportunity to take a compliant meal break. She used the CloudCords program to schedule the meal breaks. Like Gerson, Bertrand testified that employees were not expected to delay their lunch past the fifth hour of work to assist customers, and she informed employees of this and explained how to take a meal break even if a customer was waiting in line. Gerson explained that Abdolrasoul often did not like taking his meal break at the scheduled time and would take them as late as possible; or he would avoid taking meal breaks. She coached him specifically on how to improve upon taking his meal breaks as scheduled. This concern was documented in an employee evaluation, corroborating Gerson's claims.

The court found Bertrand and Gerson to be credible, thereby giving weight to their testimony.  So, although Andrew's and Nicolini's testimony seems to endorse some of Abdolrasoul's claims, substantial evidence nonetheless supports the court's conclusion because contradictory evidence supplied by Wells Fargo was credible and of solid value.  (See *Sasco, supra,* 176 Cal.App.4th at p. 535.)

### 3. *Credibility Findings and Inferences*

Plaintiffs argue that the court improperly concluded they lacked credibility based on the apparent contradictions between their deposition and trial testimony, but the statement of decision explains the court considered the substance of the testimony, consistency between trial testimony and deposition testimony, and witnesses' demeanor.[5]  It is not our role to weigh the evidence, resolve conflicts in the evidence, or consider the credibility of the witnesses.  (*Orange County Employees Assn. v. County of Orange* (1988) 205 Cal.App.3d 1289, 1293.)  Further, the court considered the Time Tracker records, but it noted that Hamideh and Abdolrasoul each testified at deposition that the self-reported statements that they were not provided the opportunity to take a compliant meal period were based on the understanding that a compliant meal period had to be completed before the end of the fifth hour of work.  The court expressly found this understanding

---

[5]    Plaintiffs allege that "nothing in the statement of decision suggests that the trial court disbelieved either Hamideh or Abdolrasoul because of their demeanor or the manner they testified," and they note that they objected to the statement of decision for failing to address the factual and legal bases of its determination that their testimony was not credible.  We are satisfied the court found their testimony lacked credibility based in part on their demeanor, as it noted in the statement of decision.  As we detailed *ante*, there is substantial evidence to support the court's implied conclusion that the plaintiffs' time records were not reliable based on their deposition testimony.

to be incorrect, which means it likewise concluded their statements that they were not offered compliant meal periods were called into doubt. That inference, coupled with testimony from supervisors supplies substantial evidence.

Accepting the evidence most favorable to Wells Fargo as true and resolving conflicting evidence to support the court's conclusions here, as we must (*Do v. Regents of University California* (2013) 216 Cal.App.4th 1474, 1492), we conclude there is substantial evidence to support the court's conclusion that these plaintiffs were not aggrieved employees.

The balance of Plaintiffs' argument on this point relies on their position that the court's adverse credibility findings were not sufficient for it to conclude they had waived the allegedly-noncompliant meal periods. But this presumes that the only way for Wells Fargo to rebut the presumption of liability created by the time records was to assert the affirmative defense of waiver. As we have explained *ante*, *Donohue* does not create such a requirement. (See *Donohue*, *supra*, 11 Cal.5th at pp. 80-81.)

Because Plaintiffs bear the burden of proving there were meal period violations, and substantial evidence supports the court's determination that they did not, Plaintiffs do not demonstrate that they are aggrieved employees who suffered meal break violations. Accordingly, they were not prejudiced by the court's finding.

## D. Adoptive Admission

Plaintiffs also argue the court prejudicially erred by failing to consider evidence of adoptive admissions.

### 1. *Additional Facts*

Wells Fargo filed a motion in limine seeking to exclude as hearsay the employees' selections of "I had no opportunity to take my compliant meal

period" or "I was provided the opportunity to take my compliant meal period." The court tentatively denied the motion, noting it looked like the self-reports could be hearsay, but an exception could apply. Its denial was without prejudice to trial objections or reconsideration based on the evidence presented at trial.

The parties submitted a joint exhibit that included columns of information, including the date of employment, the times the employee inputted as the start and end of their work day and the beginning and end of their meal breaks. There was also a column that indicated when an employee had selected the option that no compliant meal period had been offered. Wells Fargo objected to the column that identified whether the employee indicated a noncompliant meal break, contending that information was hearsay. It did not object to the admission of the rest of the document.

Plaintiffs maintained that the adoptive admission exception applied.

The court asked how Wells Fargo manifested a belief that the statement was true and pressed counsel to explain the difference between adopting a statement as true and assuming it was true for purposes of payment. Counsel argued that Wells Fargo's conduct of paying the meal premium demonstrated its adoption of the employees' claims as true. Wells Fargo responded that meal premium payments could not be viewed as adopting the truth of employee reports because the decision to pay was determined before the employees made their selections.

The court admitted the records, but it did not treat the company's silence regarding whether the inputted information was accurate or its premium payments as an admission that it failed to comply with Labor Code because it concluded the selections were not adoptive admissions under the rule. It explained: "The question is . . . whether assuming something is true

for purposes of payment is the same as adopting and manifesting a belief in its truth. I cannot find that to be the case."

The court continued: "Wells Fargo does not investigate whether or not it is accurate that employees are required to accurately input [that they received a compliant or noncompliant meal break] and that there is a payment based on the input. Whether this is, in fact, an adoptive admission could certainly, on a case-by-case basis, be that. I don't know. ¶ But based on the evidence that I have, I cannot find that simply because a payment is made after there's something input[ted] that Wells Fargo indeed manifests a belief in the accuracy of that statement. So for that reason, I am—I'm still sustaining the hearsay objection . . . ."

Plaintiffs filed objections to the statement of decision on the ground that, inter alia, it did not directly state whether or not it was admitting to meal break violations via affirmative adoption or adoption by silence, and the decision did not address whether the court applied any weight toward the alleged adoptive admission.

### 2. *Legal Standards*

Hearsay evidence is generally inadmissible unless there is a recognized exception to the rule. (Evid. Code, § 1200.) Evidence Code section 1221 can apply when a party adopts another person's statement as its own when the statement "of which the party, with knowledge of the content thereof, has by words or other conduct manifested [its] adoption of [its] belief in its truth." The adoptive admission exception allows admission of a hearsay statement when the statement is sufficiently accusatory and made under circumstances that would require a party to deny its falsity, but the party instead engages in conduct that operates as an admission or adoption of the accusation. (*People v. Davis* (2005) 36 Cal.4th 510, 535 (*Davis*).) Admissibility of this

26

evidence depends upon whether the statement was made under circumstances that called for a reply, whether the silent party understood the statement, and whether it could be inferred from the silent party's conduct that the party adopted the statement as an admission. (*Estate of Neilson* (1962) 57 Cal.2d 733, 747.) Then, "whether a defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide." (*Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 83 (*Kincaid*).)

Unless it turns on a question of law, we generally review a court's decision on the admissibility of evidence for abuse of discretion. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 (*Zhou*); *People v. Dixon* (2007) 153 Cal.App.4th 985, 997.) A trial court abuses its discretion in excluding evidence if, "in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason." (*Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 814 (*Coyne*).)

### 3. *Analysis*

Plaintiffs contend that Wells Fargo's conduct of paying premium pay any time an employee self-reported a noncompliant meal period amounted to an adoptive admission of liability that the court incorrectly declined to admit as evidence, and the failure to consider the evidence was prejudicial.

Although at least one individual supervisor reviewed Time Tracker records, the testimony consistently indicated it was company policy not to investigate the truth of the statements. Instead, the information was automatically transmitted to payroll without review, and the system automatically paid the meal period premiums. This suggests the company was not reviewing the information and calls into question whether Wells Fargo had knowledge of the statements as to each event. (See Evid. Code, § 1221.) Further, in light of the liability an employer faces by failing to pay

27

meal premiums and an employer's ability to avoid or rebut the presumption of liability by paying meal premiums (see *Brinker*, *supra*, 53 Cal.4th at pp. 1040-1041; *Donohue*, *supra*, 11 Cal.5th at p. 77), it is not clear that it is the type of statement that requires a denial of its falsity (see *Davis*, *supra*, 36 Cal.4th at p. 535.)

As the court explained, assuming the employee selection's truth for purposes of payment was not the same as manifesting a belief in the truth of that selection, Wells Fargo's lack of investigation and policy not to change the records even when there could be evidence suggesting they are not accurate shows it did not engage in any review or revision process that would require the correction of any errors. (See *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 149 [finding that engaging in a review and revision process in which errors would be corrected demonstrates manifestation of belief of accuracy of statement].) Given the law surrounding premium payments and the circumstances here, we cannot find it was unreasonable for the court to exclude the evidence as hearsay. (See *Coyne*, *supra*, 26 Cal.App.5th at p. 814.)

Even had the court erred by excluding the testimony, its explanation for doing so simply demonstrates why, as a fact-finder, it would have found that Wells Fargo's conduct could not serve as an adoptive admission. (See *Kincaid*, *supra*, 197 Cal.App.4th at p. 83 [explaining that once the statement is admitted, whether the conduct actually constituted an adoptive admission is a determination for the trier of fact].) The court treated the employees' selections as the type of statement that would require a party to deny its falsity, but it questioned whether the conduct of paying the premium operated as an admission or adoption of the accusation. The court stated: "I cannot find that simply because a payment is made after there's something

28

input[ted] that Wells Fargo indeed manifests a belief in the accuracy of that statement." Thus, Plaintiffs also have not demonstrated that had the court admitted the evidence, a different result would have been probable. (*Zhou*, *supra*, 157 Cal.App.4th at p. 1480; *San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1301-1302.)

E.  Meal Period Policy

Plaintiffs next challenge the judgment by arguing Wells Fargo's written meal period policy is unlawful, based on its introduction of Exhibit 5, a single document titled "California Meal Period and Rest Break Policy," which includes a bullet point that states, "You may not take the meal period later than 5 hours after starting the work day, unless for a specific ***business*** reason that is preapproved by your manager. If you are not hungry when the meal period must be taken, you are still required to take at least a 30-minute meal period, even if you don't eat." The trial court made factual findings that Wells Fargo had "a lawful written meal period policy" and that it established "that it has a policy scheduling lawful meal periods" for its employees. The statement of decision did not address the quoted document.

The issue before us is a mixed question of law and fact because it requires us to apply the law to a set of disputed facts. "If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) We review the application of law to undisputed facts de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212-213.) But

here, which materials constitute or reflect Wells Fargo's meal policy is a question of fact, and whether that written policy complies with California law is a legal question. Although Plaintiffs have posed the issue as predominantly one of law, it relies heavily on whether the court's conclusions regarding what constituted the written policy are supported by substantial evidence. Regardless of the standard of review we apply, we reach the same conclusion: the court did not err on this point.

Plaintiffs have identified Exhibit 5 as the document stating Wells Fargo's meal policy. Wells Fargo does not challenge this view directly, instead commenting "a single line in an ancillary onboarding document does not render Wells Fargo's meal policy unlawful," suggesting it is not the document that details the company's formal policy. It also notes that there could be situations in which a "specific business reason" would warrant a noncompliant meal period, such as when an employee voluntarily waives the meal break or delays it for reasons that would benefit the business. But it is clear in the record that the documents identified by witnesses consistently as reflecting Wells Fargo's meal period policy during the relevant time period are the posted policy (Exhibit 165) and the employee handbooks (Exhibits 157-164), none of which includes a statement regarding a delayed meal period for business reasons.

The statement of decision cites to Exhibits 155 and 157 through 164 to support its conclusion that Wells Fargo established it had a lawful written meal period policy, and it identifies exhibits 165 and 166 as workplace postings that cover the policy.

From 2016 through 2018, the employee handbook (Exhibits 157-161), which is used nationally, stated, "Several states also have specific regulations requiring that nonexempt team members take paid rest breaks. Refer to

30

Meal and Break Periods in the Time Away section for more information. Check with your manager and follow the appropriate practice for you state or business." The Meal and Break Periods section of the handbook stated, "If you're a nonexempt team member, you must take the required meal and rest periods to which you're entitled during the workday." The 2019 and January 2020 employee handbooks used similar language, noting, "Several states have specific requirements for meal periods and paid rest breaks." These statements do not directly address California-specific requirements but indicate an awareness that some states, perhaps including California, have a specific policy. None of the statements in the employee handbooks reflected in Exhibits 157 through 164 violate California law; they simply direct managers and employees to other resources.

Exhibit 165, the "California Meal Period and Rest Break Policy," identified by Wells Fargo as applicable since September 2016 and accessible to all Wells Fargo employees, states, "Nonexempt team members can work no more than 5 hours without taking an uninterrupted meal period of at least 30 minutes. The first meal period must begin no later than the end of your 5th hour of work." It also says, "If you would like to take your meal period earlier than scheduled, after the end of the 5th hour of work (or 10th hour for the second meal period), or voluntarily skip your meal period you must consult with your manager." Nothing in the language of this written policy is unlawful. It directs employees to take a 30-minute, uninterrupted meal period beginning no later than the end of the fifth hour of work and permits employees to waive their right to this break.

All branches and departments were required to post Exhibit 165 in a common area accessible to employees throughout the relevant time period. Numerous employees recognized the document and confirmed it had been

31

posted in their branches, including the branches where Hamideh and Abdolrasoul worked.  Abdolrasoul himself testified that there was a poster in his branch regarding meal periods that explained what constituted a compliant meal break.  In contrast, the origin and use of Exhibit 5 is unclear at best.  It was introduced by Plaintiffs without objection.  But there was no testimony that it was shared with managers or nonexempt employees and no indication that the document was posted in Wells Fargo branches.

Manager training materials were consistent with the language in Exhibit 165.  Those directed managers to familiarize themselves with state-specific regulations and directed them to their intranet "Teamworks Manager Center."  One training slide specific to California states, "An employee cannot work more than 5 hours without being provided the opportunity to take a meal period of at least 30 minutes."  It also notes that "[i]f a team member doesn't take a compliant meal period, Wells Fargo will pay 1 additional hour of straight time for that day in accordance with California law."  It explains that Time Tracker requires employees to select a reason for noncompliance if the meal break is recorded after the fifth hour of work begins.  And it states that employees who work no more than six hours in a day may waive their meal period.  The manager materials make no mention of delayed meal breaks for business reasons.

Exhibit 155, the Manager Policies for Meal and Rest Periods posted on the company intranet, provides California-specific requirements.  The first bullet point states:  "Nonexempt team members can work no more than 5 hours without being provided the opportunity to take an uninterrupted meal period of at least 30 minutes.  The first meal period must begin no later than the end of the 5th hour of work."  As is the case with the posted policy

(Exhibit 165), there is no business-reason exception identified in this written statement of Wells Fargo's policy.

Neither does the Time Tracker manual indicate meal breaks can be delayed for business reasons. The Time Tracker training manual defines a "compliant meal period" as "[a]t least 30 minutes in length and uninterrupted," "[begin[ning] no later than the end of [the] 5th hour of working time," and for which the employee "cannot be encouraged to skip, delay or shorten." It makes no mention of a business decision that would justify changing the timing, duration, or uninterrupted nature of the meal break.

Plaintiffs do not address the manager policies (Exhibit 155), the posted meal break requirements (Exhibit 165), or the employee handbooks (Exhibits 157 through 164) in their appellate briefs. They do not explain why it would be erroneous to treat these statements as representing Wells Fargo's written policy on this topic. They simply point to an alternative document, Exhibit 5. But unlike Exhibit 165, which Wells Fargo's person most knowledgeable identified as the relevant California Meal Period and Rest Break Policy, and which was repeatedly identified by witnesses as the policy posted in branches and used by managers, no witnesses authenticated Exhibit 5 as a policy that was in effect during the relevant time period. Plaintiffs' counsel did not ask Wells Fargo when or if the company relied on the language in Exhibit 5 or shared that document with managers or nonexempt employees. And Hamideh could not recall seeing Exhibit 5 before his deposition.

Plaintiffs express concern that the court may not have considered Exhibit 5 in reaching its conclusion regarding the lawfulness of Wells Fargo's meal break policy. But we have no reason to believe the trial court failed to consider that document. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534

33

(*Reid*) [admitted evidence is presumed considered by the trier of fact absent contrary ruling on evidentiary objection].)  And whether we ask if there is substantial evidence or we consider the record independently, we conclude Exhibit 5 does not reflect the meal period policy in effect during the relevant time.

Finally, we note there are times when employees can waive their meal breaks, ostensibly for "business reasons," such as when they are scheduled to work no more than six hours and both they and the employer agree to waive the meal break.  (§ 512, subd. (a).)  But there is no exception in the Labor Code or the Wage Order for professional and clerical employees that permits an employer to delay, shorten, or deny a meal break for "business reasons." (§ 512; Wage Order No. 4, § 11.)  Given that Exhibit 5 appears to be the only document that mentions business reasons, and given the ambiguity surrounding its origin and usage, it does not appear to represent Wells Fargo's meal break policy.  Accordingly, we independently conclude Wells Fargo's policy complies with California law.  And because we reach this conclusion, we find that Plaintiffs suffered no prejudice from the trial court's similar conclusion.

## F.  *Abdolrasoul's Meal Period Schedule*

In its statement of decision, the trial court concluded "Abdolrasoul was never scheduled for a meal period to start later than the end of the fifth hour."  Plaintiffs argue this factual conclusion was erroneous because there is contradictory evidence, a printed schedule for Abdolrasoul covering April 30, 2017, through June 2, 2017 (Exhibit 25), that would preclude such a conclusion.  Plaintiffs also maintain that the failure to consider this document was prejudicial because if the court had truly considered the

34

evidence, there is a reasonable chance a more favorable result could have been reached.

The court admitted Exhibit 25, a schedule that shows Abdolrasoul was scheduled on May 16, 2017, to work from 9:45 a.m. until 7:15 p.m., with a meal break set for 2:45 p.m.[6] Plaintiffs highlighted this document and explained their view of its significance in their closing brief. Because the meal break was scheduled to commence at 2:45 p.m., the start of the sixth hour of work, the scheduled meal break that day was noncompliant. Plaintiffs contend that this evidence directly contradicts the court's conclusion that Abdolrasoul was never scheduled for a meal period to start later than the end of the fifth hour and that any contrary factual conclusion would be an inference improperly based on speculation.

We review factual conclusions for substantial evidence. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528.) We "view[ ] the evidence in the light most favorable to the respondents [citation], resolve[ ] all evidentiary conflicts in favor of the prevailing party and indulge[ ] all reasonable inferences possible to uphold the trial court's findings [citation]." (*Ibid*.) If substantial evidence supports the finding, the reviewing court must uphold the finding "no matter how slight it may appear in comparison with the contradictory evidence . . . ." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*).)

As Wells Fargo points out in its respondent's brief, it is not clear who created Exhibit 25 or whether it was actually used. When questioned about

---

6    The time records recorded Abdolrasoul as starting his workday at 9:45 a.m. on May 16, 2017, taking a meal break beginning at 3:30 p.m., and concluding his work day at 6:45 p.m.

Exhibit 25 specifically, Business Initiative Consultant Corinne Blanchard said it was not clear from the document if CloudCords had created that schedule or if an individual had. One of Abdolrasoul's managers testified that she used CloudCords to schedule breaks, but she could change those schedules, and she scheduled meal breaks to occur prior to the fifth hour. She also said she would make adjustments to the CloudCords schedules to fit guidelines, and she never witnessed an employee she supervised not having an opportunity to take a compliant meal period. This testimony supports Wells Fargo's argument that the document may not have been a final version or actually used.

Abdolrasoul's own testimony likewise supports a conclusion that the schedule in Exhibit 25 may not have been a final version. For instance, Abdolrasoul testified at deposition that when he was a teller, someone informed him of his meal schedule in person each day, and he testified at trial that when he was a lead teller, his service manager would email the meal period schedule each day. Exhibit 25 shows a schedule for an entire month, not a single day—the way Abdolrasoul testified his meal break information was shared.

Moreover, Abdolrasoul did not identify improper scheduling as a reason for noncompliant, delayed meal breaks. During his deposition, he testified that when he took late meal breaks it was because the branch was understaffed, he was busy with customers, and people were waiting in line. He did not indicate he was scheduled for a delayed break, even by a minute. At trial he similarly testified that when he marked that he had no opportunity to take a compliant meal period, it was because there was no one in the branch to relieve him, or he was the only teller or lead teller handling

36

cash and had to stay to help customers.  Again, he did not testify that he was not scheduled for a timely meal period.

When asked directly, "[D]uring your employment with Wells Fargo, your meal period was scheduled to begin before the end of your fifth hour of work, correct?"  he replied "Yes, ma'am."  And when opposing counsel posed the question, "In fact, you don't remember a single day that you worked for Wells Fargo in which a meal period was not scheduled to begin before the end of your fifth hour of work, correct?" He again responded, "Yes, ma'am."

Thus, while there is evidence in the record that at first blush suggests Abdolrasoul was scheduled for at least one noncompliant meal break, that evidence is challenged by testimony.  Given the court's conclusion that Abdolrasoul was never scheduled for a meal period to start later than the end of the fifth hour, it is evident the court believed the testimonial evidence rather than information supplied in Exhibit 25.  (See *Reid, supra*, 50 Cal.4th at p. 534 [admitted evidence presumed considered by the trier of fact absent contrary ruling on evidentiary objection].)  Accordingly, there is substantial evidence to support this factual conclusion, and we must therefore uphold the finding.  (*Howard, supra*, 72 Cal.App.4th at p. 631.)

## G.  Cumulative Error

Although we concluded the court may have erred in its failure to apply the presumption of liability based on the time records, as we explained *ante*, any such error was harmless.  Having determined the court's remaining challenged conclusions were not erroneous, there is likewise no cumulative, prejudicial error.  (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1053-1054 [no cumulative effect of error when no error]; see *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1246 ["Since there is no error in these individual rulings, there is, of course, no cumulative error"].)

## DISPOSITION

The judgment is affirmed.  Appellants to bear costs.


                                              HUFFMAN, Acting P. J.

WE CONCUR:



O'ROURKE, J.



AARON, J.